## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **STEVEN LEE FULMER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 3:17-cv-00938-MHH** |
| | } | |
| **PCH HOTELS AND RESORTS, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>[1]

In this employment action, plaintiff Steven Lee Fulmer contends that his former employer, defendant PCH Hotels and Resorts, Inc., terminated his employment because of his age and retaliated against him for opposing discrimination in violation of the federal Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and the Alabama Age Discrimination in Employment Act, Ala. Code § 51-1-20.  Mr. Fulmer also brings state law claims against PCH for negligent and wanton hiring, training, supervision, and retention; invasion of

---

[1] The Court is issuing this opinion during a declared national emergency concerning COVID-19.  To enable parties to pursue their rights during this emergency, the Court is continuing its work.  For information about the timing of appeals, please review the information provided in the conclusion of this opinion.  The Court is including this procedural information in each opinion that it issues during the national emergency.

privacy; and intentional infliction of emotional distress.[2]  Pursuant to Rule 56 of the

Federal Rules of Civil Procedure, PCH has moved for summary judgment on Mr.

Fulmer's claims because, according to the company, no genuine issues of material

fact exist as to his claims, and PCH is entitled to judgment as a matter of law.  This

opinion resolves PCH's summary judgment motion.

## I.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute

as to a material fact that precludes summary judgment, a party opposing a motion

for summary judgment must cite "to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"The court need consider only the cited materials, but it may consider other materials

in the record." Fed. R. Civ. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or

observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853,

---

[2] The Court granted Mr. Fulmer's motion to dismiss his age harassment, defamation, and
interference with contractual or business relations claims and dismissed those claims without
prejudice. (Doc. 37).

857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court presents the summary judgment evidence in the light most favorable to Mr. Fulmer and draws all inferences in his favor.

## II.   Background

PCH employs staff at eight hotel and resort properties that the Retirement System of Alabama owns. Among those properties is the Marriott Shoals Hotel and Spa in Florence, Alabama. Mr. Fulmer worked as PCH's Director of Engineering at the Shoals from August 2003 until his termination on July 1, 2016. (Doc. 41-1, pp. 14, 82, tpp. 63, 333–34). Mr. Fulmer was 63 years old when PCH terminated him; he was 50 when PCH hired him. (Doc. 41-1, p. 59, tp. 242).

As Director of Engineering, Mr. Fulmer was responsible for the maintenance

of all facilities at the Shoals.  The facilities included a 199-room hotel, a spa, conference and fitness centers, restaurants, a cafeteria, and an indoor pool.  (Doc. 41-1, p. 14, tp. 64; Doc. 41-5, p. 53, tpp. 205–07).  Mr. Fulmer was responsible for ensuring that the facilities complied with local, state, and federal safety regulations.  (Doc. 41-1, p. 17, tpp. 75–76).  He supervised a maintenance team of several employees.  (Doc. 41-1, p. 14, tp. 64).  According to Mr. Fulmer's direct supervisor, Shoals General Manager Larry Bowser, Mr. Fulmer "managed his department well."  (Doc. 41-5, p. 37, tp. 144).  Mr. Fulmer consistently received recognition for his contribution to the Shoals, including positive annual reviews, certificates, and bonuses including a December 2015 "Executive Incentive" bonus worth "thousands of dollars."  (Doc. 48-7, p. 2).

Safety at the Shoals is at the forefront during safety inspections.  As a member of the Alabama Self-Insured Workers' Compensation Fund ("ASI") for insurance coverage of workers' compensation claims, (Doc. 41-7, pp. 4–5, tpp. 10–11, 14), PCH is subject to annual ASI workers' compensation audits—sometimes referred to as "walks" — during which an ASI representative inspects the facilities at the Shoals for potential safety and OSHA compliance issues.  (Doc. 41-7, pp. 4–5, tpp. 10, 14).  The events leading to Mr. Fulmer's termination relate to ASI walks in 2015 and 2016.  Mr. Fulmer participated in those walks as a member of the Shoals Safety Committee.

## The February 9, 2015 Workers' Compensation Walk

PCH's Corporate Director of Loss Prevention and Risk Management, Michael Dowling, scheduled a workers' compensation walk at the Shoals on February 9, 2015. (Doc. 41-2, p. 104). Mr. Dowling gave the Shoals five days' notice of the walk, which he considered "late notice." (Doc. 41-2, p. 104). Typically, after receiving an audit notice, the engineering department would spend five days preparing for a walk. (Doc. 41-14, p. 52, tpp. 201–02). In preparation for the February 2015 walk, Mr. Fulmer walked throughout the Shoals, looking for hazardous conditions that needed correction before the inspection. (Doc. 41-1, pp. 39-40, tpp. 164–66).

ASI representative Steven Sampson conducted the February 9, 2015 workers' compensation walk. Mr. Sampson was joined by Mr. Fulmer; Mr. Dowling; PCH's Human Resources Director, Yvonne Thomas; PCH's Director of Loss Prevention, Pamela Shook; PCH's Claims Representative, Robin Worden; and PCH's Corporate Vice President of Human Resources, John Cwiklik. (Doc. 41-5, p. 212). Mr. Fulmer had participated in several workers' compensation walks conducted by Mr. Sampson and joined the 2015 walk to note safety and maintenance issues that Mr. Sampson observed. (Doc. 41-1, p. 40, tp. 168).

The walk began as usual; the group walked through the Shoals's many rooms and facilities, and Mr. Sampson looked for possible safety issues. After a smooth

beginning, the walk deviated from prior walks in two ways.  First, Mr. Sampson departed from the path he normally followed through the Shoals.   Second, Ms. Shook, who had no prior walk inspection experience, departed from the usual process of opening doors along the walk.

As for his inspection route, Mr. Sampson ordinarily would inspect the conference center after inspecting the hotel's spa area.  (Doc. 41-1, p. 47, tp. 194). On the 2015 walk, Mr. Fulmer expected Mr. Sampson to follow his normal route, so, as the group moved through the spa area, Mr. Fulmer said, "now to the conference center."  (Doc. 41-1, p. 47, tp. 194; Doc. 41-2, p. 122).  But Mr. Dowling said that the group still needed to see the pump rooms for the spa and the mechanical rooms by the pool and directed Mr. Sampson to those areas.  (Doc. 41-2, p. 122).  Mr. Sampson had not been shown those areas on previous walks.  (Doc. 41-7, pp. 42, 44; tpp. 162, 171).  So Mr. Sampson later told Mr. Dowling that he (Mr. Sampson) "felt that he ha[d] been misled over the years and only shown certain areas" and that Mr. Fulmer had not been forthright.  (Doc. 41-2, p. 122; Doc. 41-7, p. 44, tpp. 170–71).[3]

With respect to doors along the inspection route that were closed, PCH staff ordinarily would unlock and open doors only when the ASI inspector asked for them to be opened.  (Doc. 41-1, p. 47, tp. 196).  But, during the February 2015 walk, Ms.

---

[3] In his deposition, Mr. Samson stated:  "Well, 2013, 2014 visits were the years we did not see the – the pool-level mechanical rooms.  '15 would have been the first year that we saw those rooms." (Doc. 41-7, p. 44, tp. 171).

Shook unlocked and opened all doors for Mr. Sampson.  (Doc. 41-4, p. 47, tp. 196).

Unbeknownst to Mr. Fulmer, Mr. Dowling instructed Ms. Shook to do so.  (Doc. 41-1, pp. 47, 51, tpp. 196, 211; Doc. 41-10, p. 39, tp. 149).  So, after Ms. Shook opened

the door to a mechanical room in the main pool area, Mr. Fulmer whispered to Ms.

Shook to stop opening doors and to only open doors when specifically asked by Mr.

Sampson.  (Doc. 41-1, p. 47, tp. 19; Doc. 41-2, p. 122; Doc. 48-7, pp. 3–4, ¶ 14).

Mr. Fulmer stated that he "was not trying to hide anything from the inspectors" by

telling Ms. Shook to stop opening doors.  (Doc. 48-7, pp. 3–4, ¶ 14).  Instead, he was

"trying to be discrete in letting [Ms.] Shook know how the procedure was done since

it was her first time."  (Doc. 48-7, pp. 3–4, ¶ 14).  Mr. Sampson did not hear what

Mr. Fulmer whispered, and the whispering did not cause Mr. Sampson concern.

(Doc. 41-7, p. 42, tpp. 161–62).

During the walk, Mr. Sampson discovered a lockout/tagout ("LOTO") issue

with electrical equipment in the Shoals's conference center.  (Doc. 41-2, pp. 109–10).   LOTO procedures established by OSHA protect employees from the

unexpected energization of electrical equipment while performing maintenance.  *See*

"Control of Hazardous Energy Lockout/Tagout," Occupational Safety & Health

Administration,  https://www.osha.gov/Publications/3120.html  (last visited March

23, 2020).  LOTO standards require more than just turning off electrical equipment

when performing maintenance on the equipment; rather, the equipment must be

"locked out" from its power source "as an absolute measure to ensure that [the equipment] will not be energized for any reason until their work is complete and the lock has been removed." (Doc. 41-2, p. 110). And locked out equipment must be "tagged out" with a "prominent warning device[] that an authorized employee fastens to energy-isolating devices to warn employees not to reenergize the machine while he or she services or maintains it." *See* "Control of Hazardous Energy Lockout/Tagout," Occupational Safety & Health Administration, https://www.osha.gov/Publications/3120.html (last visited March 23, 2020).

Mr. Sampson described the LOTO issue discovered in the conference center in his post-walk report as follows:

> Questions were asked [during the walk] about power distribution for events and procedures that are followed when making these connections to the electrical boxes and panels in the conference center. It was indicated that the breaker to the box where the connection is made is turned off before engineering employees attempt to make the connection. It was stated that they do not lockout the breaker in this situation due to the fact that the engineer is working right next to the breaker box. This is not correct procedure. Anytime that anyone needs to turn off a breaker to make a connection, that breaker must be locked out as an absolute measure to ensure that the box they are working in will not be energized for any reason until their work is complete and the lock has been removed.

(Doc. 41-2, pp. 109–10; *see also* Doc. 41-1, pp. 41–42, tpp. 172–73). Mr. Sampson recommended that Mr. Fulmer and the other members of the Engineering Department receive "additional training on lockout/tagout and when it is to be used should be considered. This training should be thorough, well understood and

documented." (Doc. 41-2, p. 110; Doc. 41-7, pp. 58–59, tpp. 227–29).

In total, during the February 2015 walk, Mr. Sampson identified 22 deficiencies, including the LOTO issue. (Doc. 41-2, pp. 107–11). Most deficiencies concerned storage issues or fall hazards. For example, Mr. Sampson reported a hose on the ground, an unsecured extension cord, a walking ramp without a railing, and cramped storage areas. (Doc. 41-2, pp. 107–11). Mr. Fulmer was not surprised that Mr. Sampson discovered deficiencies. (Doc. 48-7, p. 3, ¶ 10). Mr. Fulmer stated that workers' compensation walkthroughs are "important and routine" and that "it was perfectly normal and expected that Steve Sampson, or any other inspector, would find deficiencies for us to correct." (Doc. 48-7, p. 3, ¶ 10).

Mr. Fulmer's conduct during the February 9, 2015 walk—the "now to the conference center" statement and the whisper to Ms. Shook—troubled Mr. Dowling. So Mr. Dowling reported the incident to PCH's CEO, Tony Davis. (Doc. 41-2, p. 122).

Mr. Fulmer's conduct also troubled Mr. Bowser. Though he did not participate in the inspection walk, Mr. Bowser testified that "[t]he comment that [Mr. Fulmer] made to Pam Shook regarding opening doors created an eroded trust and created appearance of impropriety with the auditors . . ." (Doc. 41-5, p. 26, tp. 97). Mr. Bowser spoke with Mr. Fulmer about those concerns and issued a February 2015 memo documenting the conversation. (Doc. 41-5, p. 26, tp. 97; Doc. 41-5, p. 210).

9

Following the conversation with Mr. Fulmer, Mr. Bowser informed Mr. Davis and Mr. Cwiklik that he (Mr. Bowser) "had a good conversation with Steve [Fulmer]," that Mr. Fulmer was "aware that his comment to Pam [Shook] was wrong," and that Mr. Fulmer "stated that he intend[ed] to apologize personally to [Mr. Davis and Mr. Cwiklik] and to Pam [Shook] and Mike [Dowling]."  (Doc.  41-2, p. 128).  Mr. Fulmer did apologize to each of those people.  (Doc. 41-1, p. 49, tp. 204).

The memo documenting Mr. Bowser's conversation with Mr. Fulmer recounts that Mr. Fulmer made the "now to the conference center" statement and whispered to Ms. Shook to stop opening doors.  (Doc. 41-2, p. 127).  The memo also states that Mr. Fulmer's comment to Ms. Shook "was inappropriate and created an appearance of impropriety"; put Ms. Shook "in a bad spot"; "created [an] impression that we were trying to hide something from our insurance providers"; and "created doubt and eroded our credibility with Steve Sampson and Robin Worden."  (Doc. 41-2, p. 127).  The memo concludes:  "In the future it is critical that Steve [Fulmer] cooperate fully with any outside inspection especially when it comes to matters of safety," and warns that "[f]ailure to do so will result in further disciplinary action and possibly termination."  (Doc. 41-2, p. 127).[4]   Mr. Bowser did not complete a formal

---

[4] In his brief in opposition to PCH's summary judgment motion, Mr. Fulmer states that "someone doctored the subject line in the original memo after Plaintiff signed it.  (*Compare* doc. 41-5, p. 210, *with* 41-5, p. 212)."  (Doc. 49, p. 19, n. 10).  On Doc. 41-5, p. 212, someone, using a pen, crossed through the "4" in "2014" and wrote "5" to correct the date to "2015."  The correction is accurate.

"ASSOCIATE DISCIPLINARY ACTION" form concerning Mr. Fulmer's conduct on the 2015 walk.  (*See* Doc. 41-13, p. 80).   Mr. Bowser testified that his conversation with Mr. Fulmer in February 2015 "was not progressive discipline. That was a momentary lapse in judgment" by Mr. Fulmer "that needed to be documented."  (Doc. 41-5, p. 25, tp. 96).

Mr. Fulmer testified that, in early March 2015, he trained his employees on LOTO procedures.  (Doc. 41-1, pp. 44-45, tpp. 183–86).  Mr. Fulmer also testified that he emailed to Mr. Bowser and Ms. Thomas minutes of the engineering department meeting at which the LOTO training occurred.  (Doc. 41-1, pp. 44–45, tpp. 183–85).  Mr. Fulmer told Mr. Bowser that the LOTO training was completed, and Mr. Bowser reported that information to Mr. Sampson.  (Doc. 41-5, p. 37, tpp. 142–44; Doc. 41-5, pp. 199-200).  PCH did not provide separate LOTO training to Mr. Fulmer.

Mr. Fulmer worked diligently to help correct the safety issues that Mr. Sampson identified during the 2015 walk.  (*See* Doc. 41-1, pp. 44, 48, tpp. 182, 200; Doc. 41-5, pp. 213–15; Doc. 41-7, p. 38, tpp. 146–47).  By the end of March 2015, with Mr. Fulmer's assistance, the Shoals staff corrected 19 of the 22 safety issues that Mr. Sampson identified.  (Doc. 41-2, pp. 112–16).  Mr. Bowser thanked Mr. Fulmer via email on March 27, 2015 for Mr. Fulmer's "excellent job reacting to [the safety issues] as quickly as [he] did."  (Doc. 41-5, p. 213).

11

Mr. Sampson was pleased with the Shoals's response to the walk.  After a follow-up visit to the Shoals in September 2015, Mr. Sampson informed Mr. Dowling that the Shoals staff followed all recommendations, committed "a lot of time and effort . . . to addressing the deficiencies," and restored "pride in the condition of the workplace."  (Doc. 41-5, p. 215).  Mr. Bowser, in an email to Mr. Fulmer and Ms. Shook on the day of the September walk, called the inspection "a proud day for the Shoals."  (Doc. 41-3, p. 5).  On October 13, 2015, Mr. Dowling sent an email to Mr. Fulmer, Mr. Bowser, Ms. Thomas, and Ms. Shook that stated, "I just want to say THANK YOU to you all and your staffs again, for the time and effort you have taken to correct the Workers Compensation recommendations from earlier this year."  (Doc. 41-3, p. 7) (emphasis in original).  The following day, Mr. Bowser sent an email to the Shoals's managers that stated:   "Thank you for everyone's efforts that went into this inspection.  I wanted to share this success.  Love you guys!"  (Doc. 41-3, p. 6).

Mr. Fulmer received his 2015 annual review in December 2015.  He received the highest possible rating in 10 of 14 categories.  (Doc. 41-6, pp. 2–9).  For example, he received the highest possible rating for "Developing Others," and he was credited with "do[ing] a great job training and developing his staff."  (Doc. 41-6, p. 5).  Mr. Fulmer was encouraged to invest more "in his own development" and to "take advantage of learning best practices from other hotels."  (Doc. 41-6, p. 4).

**Mr. Fulmer's Retirement Plans**

In February 2016, Ms. Thomas met with Mr. Fulmer for lunch. She asked him when he planned to retire. He was 62 at the time of the meeting. Mr. Fulmer told Ms. Thomas that he planned to work until he was 70. (Doc. 41-1, p. 115). In his declaration, Mr. Fulmer states that as he understands it, "older employees drive the premiums up in a group health insurance policy," and PCH, in January 2016 implemented a self-insured group health insurance policy. (Doc. 41-1, p. 115).

**The June 21, 2016 Workers' Compensation Walk**

Mr. Dowling gave Mr. Fulmer and the rest of the Shoals staff only 24 hours' notice of a walk to be conducted at the Shoals on June 21, 2016. (Doc. 41-6, p. 26). Mr. Dowling testified at his deposition that giving such late notice did not trouble him because the Shoals experienced "unannounced walk-throughs all the time" for which staff should always be prepared. (Doc. 41-12, p. 5, tp. 292). But Mr. Fulmer was busy managing contractors who were working on eight boilers and a hot water storage tank on the Shoals's property when Mr. Dowling announced the walk. (Doc. 41-12, p. 7, tp. 297).

After Mr. Dowling emailed the late notice, Mr. Bowser advised Mr. Dowling that he (Mr. Bowser) and Ms. Thomas would not be at the Shoals on June 21, 2016 and asked if the Shoals should reschedule the walk. (Doc. 41-6, p. 26; Doc. 41-12, p. 6, tp. 295). Mr. Dowling declined and told Mr. Bowser that "Pam and Steve

should be able to handle," that he (Mr. Dowling) did "not foresee any issues," and that Mr. Bowser's and Ms. Thomas's absences "shouldn't be an issue" because "you guys did a great job last year cleaning everything up." (Doc. 41-6, p. 26; Doc. 41-12, p. 6, tp. 295).

Mr. Sampson, joined by Mr. Fulmer, Ms. Shook, Mr. Dowling, and Ms. Worden, conducted the walk on June 21, 2016. (Doc. 41-3, p. 26). During the walk, Mr. Sampson discovered a LOTO issue; a washing machine in the hotel laundry room had its side panel removed and internal parts exposed for repair, and the machine was not locked out or tagged out. (Doc. 41-3, p. 30). An employee in the Engineering Department, Engineering Supervisor Jerron Emerson, had removed the side panel of the washing machine to repair it and had failed to lock out and tag out the machine. (Doc. 41-1, p. 73, tp. 298; Doc. 41-2, pp. 18–19, ¶ 5; Doc. 41-6, p. 46).

Mr. Sampson also smelled gas in a utility room during the walk. (Doc. 41-6, p. 69, tp. 269; Doc. 41-8, p. 43, tp. 167). Mr. Fulmer had received a report of the odor of gas in that area days before the walk. (Doc. 41-1, pp. 70–71). Mr. Sampson did not record the odor as an OSHA violation, and he did not recommend that PCH investigate the odor because he did not consider the situation a workers' compensation issue. (Doc. 41-7, pp. 68–69, tpp. 265–70).

Mr. Fulmer responded to the issues observed during the walk that same day. First, he reported the LOTO violation to Mr. Emerson, who immediately locked out

and tagged out the washing machine.  (Doc. 41-6, p. 46).  Then Mr. Fulmer reported the LOTO violation to Mr. Bowser via email.  (Doc. 41-3, p. 46).  In the email, Mr. Fulmer told Mr. Bowser that the disconnected washing machine "had been that way for a week and a half waiting on parts" and that he (Mr. Fulmer) told "them" (meaning the inspection team) at lunch that he "had seen that" LOTO violation the day before the inspection "and complete[ly] forgot about [it]."  (Doc. 41-3, p. 46).[5] Mr. Fulmer told Mr. Bowser that he had conducted LOTO training in September 2015, and he was trying to schedule training for his department the following day. (Doc. 41-3, p. 46).  Mr. Fulmer called a technician to investigate the gas odor; the technician found and repaired several small gas leaks the day after the inspection. (Doc. 41-1, pp. 70–71, tpp. 288–90).

**Mr. Fulmer's Termination**

Mr. Dowling returned from the June 21, 2016 walk and prepared a report that he filled with pictures that he took along the walk.  At the end of the 10-page report, Mr. Dowling wrote:  "Life Safety, Security, and cleanliness issues that just do not

---

[5] In his brief, Mr. Fulmer provides background information regarding the LOTO violation relating to the washing machine.  (Doc. 49, p. 27).  He also states that he was "unaware that Emerson had not conducted a proper LOTO" and that "[t]he LOTO violation was not visible" to him "while simply walking by the housekeeping doorway."  (Doc. 49, p. 28).  These assertions contradict the statement that Mr. Fulmer made to Mr. Bowser the day of the June 2016 walk.  Mr. Fulmer cites Mr. Bowser's testimony that he believed Mr. Emerson's failure to tag out the washing machine was an oversight.  (Doc. 49, p. 28) (citing Doc. 41-5, p. 88, tp. 345).  Mr. Bowser testified that Mr. Fulmer bore greater responsibility for the LOTO violation because Mr. Fulmer was the leader of the Engineering Department.  (Doc. 41-5, p. 88, tpp. 345–46).

meet the expectations of PCH Hotels and Resorts and our owners." (Doc. 41-3, pp. 26–36).

On June 24, 2016, Mr. Bowser and Ms. Thomas met with Mr. Fulmer to discuss the LOTO and gas issues discovered during the June 21, 2016 walk. (Doc. 41-1, p. 79, tpp. 321–23). Because the June 2016 walk revealed a LOTO violation similar to the LOTO concern raised during the February 2015 walk, Mr. Bowser and Ms. Thomas asked Mr. Fulmer whether the LOTO training that he said happened after the February 2015 walk actually took place. (Doc. 41-1, p. 79, tp. 321; Doc. 41-1, pp. 267–68; Doc. 41-12, p. 68, tpp. 265–67). Mr. Fulmer told them that the LOTO training did not take place. (Doc. 41-1, p. 79, tp. 321). There is no evidence that Mr. Bowser or Ms. Thomas, in June 2016, reviewed records, spoke to members of the Engineering Department, or took other steps to determine whether Mr. Fulmer conducted LOTO training in the spring of 2015.[6]

On June 26, 2016, Mr. Dowling sent Mr. Davis, Mr. Bowser, and others his report regarding the June 21, 2016 walk. (Doc. 41-11, p. 48–49, tpp. 186–91). At his deposition, Mr. Bowser described Mr. Dowling's report as documentation of the reasons for terminating Mr. Fulmer. (Doc. 41-5, pp. 121–22, tpp. 480–81). These reasons included, among other items, a mixer powered by an extension cord, broken

---

[6] At the hearing on Mr. Fulmer's claim for unemployment benefits on September 27, 2016, and at his deposition in this case on June 15, 2018, Mr. Fulmer testified that he conducted LOTO training in March 2015 but mistakenly told Mr. Bowser and Ms. Thomas that he did not. (Doc. 41-1, p. 79, tp. 321; Doc. 41-1, pp. 267–68).

floor tiles, and boxes stacked too high.  (Doc. 41-3, pp. 27–28).  Mr. Dowling's report described the washing machine LOTO violation and characterized it as a "**Major OSHA Violation**." (Doc. 41-3, p. 30) (emphasis in original).  The report also mentioned "the smell of natural gas" discovered in the utility room.  (Doc. 41-3, p. 31).

After reading Mr. Dowling's report and speaking with him, Mr. Bowser recommended to Mr. Davis and Mr. Cwiklik that PCH terminate Mr. Fulmer.  (Doc. 41-5, pp. 115–16, 118, tpp. 455–57, 465–67).  Mr. Davis and Mr. Cwiklik agreed. (Doc. 41-5, pp. 115–16, 118, tpp. 455–57, 465–67).

So, on July 1, 2016, Mr. Bowser and Ms. Thomas met with Mr. Fulmer and informed him that PCH was terminating his employment because the company "lost confidence in his ability to lead his department and in his judgment." (Doc. 41-1, p. 82, tpp. 333–34; Doc. 41-5, p. 117, tp. 462).  Mr. Bowser and Ms. Thomas gave Mr. Fulmer a form titled "Associate Disciplinary Action" that documented his termination.  (Doc. 41-1, p. 82, tpp. 333–34; Doc. 41-3, p. 93).  The form described the LOTO violation and gas leak discovered during the June 21, 2016 walk and stated that Mr. Fulmer was "suspended pending termination for unsatisfactory performance creating an unsafe work environment."  (Doc. 41-3, p. 93).  The form did not mention gross negligence or gross misconduct.  PCH's "Personnel Action Form" relating to Mr. Fulmer's termination states that "Special Circumstances"

17

warranted termination.  (Doc. 41-15, p. 64).

Ms. Thomas told Mr. Fulmer that he had three days to appeal the anticipated termination, but she did not explain to whom Mr. Fulmer should appeal.  PCH's discipline policy does not mention a three-day appeal period.  (Doc. 41-13, pp. 69–70).  Mr. Bowser and Ms. Thomas gave Mr. Fulmer a written "Confidential Settlement Agreement and Release."  (Doc. 41-13, p. 70, tpp. 273–74).  Mr. Bowser told Mr. Fulmer that he had 21 days to consider the settlement agreement.  (Doc. 41-13, p. 70, tp. 274).  If he had agreed to PCH's proposed settlement, Mr. Fulmer would have waived his right to bring claims against PCH arising out of his termination in exchange for a severance payment of three months' salary and his unused vacation days and paid time off.  (Doc. 41-1, p. 82, tp. 334; Doc. 41-3, pp. 94–100).  Mr. Bowser and Ms. Thomas informed Mr. Fulmer that he could consult with an attorney before signing the settlement agreement.  (Doc. 41-1, p. 334; Doc. 41-13, p. 63, tp. 245).  Mr. Fulmer did not sign the agreement, and PCH did not pay him for his unused vacation days or paid time off.  (Doc. 41-1, p. 116; Doc. 41-3, p. 100; Doc. 41-13, pp. 62–63, tpp. 244–45).

After terminating Mr. Fulmer, PCH temporarily assigned Mr. Fulmer's duties to Mr. Emerson, the engineer who committed the washing machine LOTO violation.  (Doc. 41-5, p. 88, tpp. 347–48).  At the time, Mr. Emerson was 32 years old.  (Doc. 41-5, p. 88, tp. 346).  Mr. Bowser characterized Mr. Emerson's failure to lock out

and tag out the washing machine as an "oversight" and a "gross error," but not gross misconduct or negligence, so PCH only issued Mr. Emerson a written warning. (Doc. 41-5, pp. 88, 91, tpp. 345–46, 359).  Later in 2016, PCH gave Mr. Emerson a raise, named him "Supervisor of the Quarter" and "Supervisor of the Year," and awarded him multiple cash bonuses.  (Doc. 41-5, pp. 90–91, tpp. 356–59).

On August 1, 2016, PCH hired Brad Lingle as Mr. Fulmer's permanent replacement as Director of Engineering and paid Mr. Lingle five dollars an hour more than the company had paid Mr. Fulmer.  (Doc. 41-5, p. 95, tpp. 373–75; Doc. 41-6, pp. 76–77, 84–85).  Mr. Lingle was 50 years old when PCH hired him.  (Doc. 48-3, p. 3, tp. 10).  After PCH offered Mr. Lingle the job, PCH received results from an outside organization's test of Mr. Lingle's potential fit for an engineering position.  (Doc. 41-5, pp. 93–94, tpp. 368–69; Doc. 41-6, pp. 68–75).  The test results indicated that "it is unlikely that [Mr. Lingle] is a good fit for an engineer position within the manufacturing industry"; that Mr. Lingle would likely "struggle with the type of complex analysis and decision making that requires critical thinking skills"; and that, compared with other engineers, Mr. Lingle may be more likely to misinterpret situations, overlook valuable information, apply faulty logic, and draw conclusions not supported by evidence. (Doc. 41-6, pp. 69–70).

Mr. Fulmer timely filed a charge of discrimination with the EEOC on August 11, 2016.  (Doc. 41-1, pp. 112–16).  In his charge, Mr. Fulmer provided a narrative

of the facts discussed above and alleged that PCH terminated him because of his age. (Doc. 41-1, pp. 113–16).  To support his charge of age discrimination, Mr. Fulmer identified as comparators Mr. Emerson and Mr. Lingle.  (Doc. 41-1, pp. 114–16). Mr. Fulmer also stated that he knew of a younger Director of Engineering at PCH's hotel in Auburn, Alabama who was not terminated for a LOTO violation.  (Doc. 41-1, p. 115).  And Mr. Fulmer stated that he was subject to age-based comments, was a casualty of PCH's effort to reduce its self-insured employee health program costs, and was familiar with several safety issues at the Shoals that PCH did not attempt to rectify.  (Doc. 41-1, pp. 115–16).  After the EEOC proceeding concluded, Mr. Fulmer brought this action.

## III.   Discussion

### ADEA and AADEA Age Discrimination Claims

Mr. Fulmer asserts that PCH, in violation of the ADEA and the AADEA, terminated him because he was 63 years of age.  Both the ADEA and the AADEA prohibit age discrimination against employees who are 40 years of age or more.  29 U.S.C. §§ 623(a), 631(a); Ala. Code § 25-1-21.  The same analytical framework applies to ADEA and AADEA age discrimination claims.  *Perry v. Batesville Casket Co.*, 551 Fed. Appx. 987, 989 (11th Cir. 2014) (citing *Robinson v. Ala. Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007)).

A plaintiff may use circumstantial evidence to defeat a motion for summary

judgment on his ADEA discrimination claim in several ways.  For example, a plaintiff may employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).  Under the *McDonnell Douglas* framework, a plaintiff must present a *prima facie* case of discrimination.  *Sims*, 704 F.3d at 1332.  In an ADEA case, the plaintiff's *prima facie* case consists of proof that:  "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged."  *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015).  If the plaintiff establishes his *prima facie* case, then he creates a presumption of unlawful discrimination.  *Liebman*, 808 F.3d at 1298.

The burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for taking the adverse employment action against the plaintiff.  *Sims*, 704 F.3d at 1332–33.  The employer only has to state a reason for the employment action; the employer does not have to establish that the given reason was the actual reason for the adverse action.  *Sims*, 704 F.3d at 1332–33.  If the employer satisfies this light burden, then the employer rebuts the presumption of discrimination raised by the plaintiff's *prima facie* case.  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011).

21

If the employer rebuts the presumption of discrimination, then the burden shifts back to the employee to show that the employer's proffered legitimate nondiscriminatory reason is pretext for unlawful discrimination. *Smith*, 644 F.3d at 1326. At this stage, "the plaintiff's 'burden . . . merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Smith*, 644 F.3d at 1326 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). If the employer states several nondiscriminatory reasons for the employment action, then "the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). A plaintiff can show a genuine issue of material fact concerning pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. A genuine issue of pretext exists if reasonable jurors could find "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's stated nondiscriminatory reason for the employment action. *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). When evaluating evidence offered to establish pretext, a district court does not "sit as a super-personnel department that reexamines an entity's business decisions" or judge the accuracy of information on

which the employer relied in making its decision.  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quotation omitted).

"[T]he *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith*, 644 F.3d at 1328 (reversing the district court's grant of summary judgment because sufficient circumstantial evidence of discrimination existed apart from the district court's *McDonnell Douglas* analysis). A plaintiff "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328.  For instance, a plaintiff "will always survive summary judgment if he presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotations omitted).  A plaintiff can show a convincing mosaic with "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)).  No matter the form of circumstantial evidence that a plaintiff presents, "so long as the

circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Smith*, 644 F.3d at 1328.

For purposes of summary judgment, PCH concedes Mr. Fulmer's *prima facie* case under the *McDonnell Douglas* framework. (Doc. 42, p. 24). PCH gives three reasons for terminating Mr. Fulmer: Mr. Fulmer neglected the LOTO violation with the washing machine discovered during the June 2016 walk; Mr. Fulmer neglected a potential gas leak in 2016; and Mr. Fulmer failed to conduct LOTO training in 2015 and lied about conducting it. (Doc. 42, pp. 1–2). These reasons satisfy PCH's burden under *McDonnell Douglas* of articulating a non-discriminatory reason for terminating Mr. Fulmer. Consequently, to avoid summary judgment, Mr. Fulmer must show, by identifying disputed facts for a jury to examine, that PCH's articulated reasons for terminating him are pretext for age discrimination or that the disputed facts and the reasonable inferences from those facts create a convincing mosaic of circumstantial evidence from which jurors reasonably could infer discriminatory intent.

With respect to the first reason PCH gives for terminating Mr. Fulmer, the 2016 washing machine LOTO violation, the record demonstrates that on an "Associate Disciplinary Action" form dated July 1, 2016, PCH listed that OSHA violation as a reason for Mr. Fulmer's anticipated termination. (Doc. 41-3, p. 93).

The record also demonstrates that Mr. Fulmer saw the LOTO violation the day before the June 2016 walk, but he forgot to tag the machine or to instruct Mr. Emerson, the employee who committed the LOTO violation, to tag the machine.  In the memo that he wrote to Mr. Bowser on the day of Mr. Sampson's June 2016 inspection, Mr. Fulmer stated that he told Mr. Sampson at lunch that he had seen the LOTO violation the day before "and complete[ly] forgot about [it]."  (Doc. 41-3, p. 46).  Mr. Fulmer continued:

> Recommendations from last year was to us lockout at the CC power distribution and that training was conducted. We did have training in September. Michael recommended that we have training ASAP with engineering. Trying for tomorrow or Thursday.
>
> I think this will be an issue . . . I don't have a good feeling.

(Doc. 41-3, p. 46; *see also* Doc. 41-1, p. 260).[7]  In his written report concerning the June 2016 walk, Mr. Dowling described the washing machine LOTO issue as a "**Major OSHA Violation**."  (Doc. 41-3, p. 30) (emphasis in original).

Mr. Fulmer argues that PCH did not really consider the LOTO violation an offense warranting termination because after PCH fired him, PCH temporarily replaced him with Mr. Emerson after writing Mr. Emerson up for the LOTO violation.  (Doc. 41-5, pp. 88–89, tpp. 348–49; Doc. 41-6, pp. 45–46).  There were at least five other employees in the engineering department who PCH could have

---

[7] Mr. Fulmer conducted LOTO training in June 2016.  (Doc. 41-3, pp. 89–90, 92).

selected to temporarily replace Mr. Fulmer while PCH searched for a permanent replacement. (Doc. 41-3, p. 92; *see also* Doc. 41-1, p. 14, tp. 64). In the months that followed Mr. Emerson's temporary assignment as the lead employee in the engineering department, PCH named Mr. Emerson "Supervisor of the Quarter" and "Supervisor of the Year" and awarded him multiple cash bonuses. (Doc. 41-5, pp. 90–91, tpp. 356–59; Doc. 41-6, p. 45). Mr. Emerson's annual review for the dates October 1, 2015 through September 30, 2016 describes him as a "good multi tasker [sic]" who "is effective in identifying mechanical problems and resolving them in an efficient manner," and "work[s] hard to improve safety procedures." (Doc. 41-6, pp. 64–67). "A reasonable jury could conclude that if [PCH] were truly concerned about" LOTO violations, "it would not have chosen to replace [Mr. Fulmer] with the very person who had [committed the 2016 LOTO violation] in the first place," and PCH would not have named that person "Supervisor of the Year." *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 831 (11th Cir. 2000).[8]

---

[8] PCH argues that none of Mr. Fulmer's purported comparators, including Mr. Emerson, satisfies the comparator standard that the Eleventh Circuit established in *Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019). But Mr. Fulmer's proposed comparators do not have to meet that standard at the pretext stage. In *Lewis*, the Eleventh Circuit found that a plaintiff relying on comparator evidence to establish a *prima facie* case of discrimination under *McDonnell Douglas* must show that the plaintiff and his comparator were "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218. The Eleventh Circuit held that district courts should conduct the "similarly situated in all material respects" comparator analysis at the *prima facie* case phase of *McDonnell Douglas*, not at the pretext stage. *Lewis*, 918 F.3d at 1224. The Eleventh Circuit locked the "similarly situated in all material respects" analysis into the *prima facie* case stage because the purpose of the *prima facie* case is to "give rise to a valid inference that [the plaintiff's] employer engaged in unlawful intentional 'discrimination.'" *Lewis*, 918 F.3d at 1222. And the Eleventh Circuit found that "it is only by demonstrating that her employer has treated 'like'

With respect to the gas leak, the second reason PCH gives for terminating Mr. Fulmer, the record demonstrates that on the "Associate Disciplinary Action" form dated July 1, 2016, PCH listed as a reason for Mr. Fulmer's anticipated termination a gas leak "that had not been addressed even after it had been reported." (Doc. 41-3, p. 93). In his written report concerning the June 2016 walk, Mr. Dowling described the gas odor as "Life/Safety Issues OSHA." (Doc. 41-3, p. 30).

The record demonstrates that on June 17, 2016, Pam Shook reported to James Holden in the Shoals engineering department that she smelled the odor of gas in a utility area. (Doc. 41-3, p. 48). Mr. Holden "was unsure about the smell," so he called Mr. Fulmer. Mr. Fulmer attributed the smell to a return hose, so he did not call a technician to inspect the odor. (Doc. 41-3, p. 48; *see also* Doc. 41-1, p. 70, tpp. 287–88). A few days later, during the June 21, 2016 walk, Mr. Sampson smelled gas in the utility area. (Doc. 41-6, p. 69, tp. 269; Doc. 41-8, p. 43, tp. 167). He stated during his deposition that the odor of gas was "pretty clear." (Doc. 41-7, p. 69, tp. 269). But Mr. Sampson did not instruct PCH to investigate the odor, and he

---

employees 'differently'—*i.e.*, through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination*." *Lewis*, 918 F.3d at 1223 (emphasis in original).

As mentioned, for purposes of summary judgment, PCH has conceded Mr. Fulmer's *prima facie* case, and PCH replaced Mr. Fulmer with a younger employee. Therefore, PCH's treatment of other employees, even if those employees are not similarly situated to Mr. Fulmer in all material respects, may provide evidence from which reasonable jurors could infer that PCH's reasons for terminating Mr. Fulmer were pretext for age discrimination. And the *Lewis* analysis did not change the well-settled rule that a plaintiff may prove discriminatory intent by offering a mosaic of circumstantial evidence.

did not include the gas odor in his post-walk report. (Doc. 41-7, pp. 68–69, tpp. 265–70). Mr. Fulmer promptly called in a technician to find and repair any gas leaks. The technician found and repaired several small gas leaks the next day. (Doc. 41-1, pp. 70–71, tpp. 288–90).

With respect to the 2015 LOTO training, the third reason PCH gives for terminating Mr. Fulmer, the record demonstrates that "Associate Disciplinary Action" form dated July 1, 2016 does not mention Mr. Fulmer's June 24, 2016 conversation with Mr. Bowser and Ms. Thomas in which he (Mr. Fulmer) reported that he did not "do[] the 2015 LOTO training" (Doc. 41-3, p. 93; Doc. 42, p. 19, ¶ 33). The form does not mention dishonesty or improper conduct. The form, which Mr. Fulmer and Ms. Thomas signed, states broadly that Mr. Fulmer was "suspended pending termination for unsatisfactory performance creating an unsafe work environment." (Doc. 41-3, p. 93). *See Keaton v. Cobb County*, 545 F. Supp. 2d 1275, 1303 (N.D. Ga. 2008) ("Evidence of a post-hoc attempt to justify an employment decision may be evidence of pretext.") (citations omitted)

Mr. Fulmer testified that he conducted LOTO training for the members of the Shoals engineering department in late February/early March 2015, and he emailed to Mr. Bowser and Ms. Thomas minutes of the training meeting to document the training. (Doc. 41-1, pp. 44-45, tpp. 183–86). On March 27, 2015, Mr. Bowser stated in writing to PCH's worker's compensation carrier that "thorough, well

understood and documented" LOTO training was "completed 3/3/15." (Doc. 41-5, pp. 199–200). Mr. Bowser testified in his deposition that he did not receive documentation of training from Mr. Fulmer, and he reported to PCH's carrier that the training was "documented" as of "3/3/15" because he relied on Mr. Fulmer's statement that LOTO training was complete. (Doc. 41-5, pp. 37, tpp. 141–43). This is a textbook factual dispute.

PCH documents indicate that Mr. Fulmer conducted LOTO training on September 1, 2015, June 22, 2016, and July 1, 2016. PCH documents reflect that Mr. Emerson participated in the 2015 and 2016 LOTO training. (Doc. 41-6, pp. 54–60; *see also* Doc. 41-5, p. 89, tp. 349). Records of OSHA LOTO training should appear in the personnel file of each employee who participated in the training, and OSHA training should occur annually (Doc. 41-5, pp. 89-90, tpp. 352–55), but there is no evidence that Mr. Bowser or anyone else examined the files of the employees who worked in the engineering department in 2015 and 2016 to determine when, if at all, Mr. Fulmer provided LOTO training in 2015. In its brief, PCH intimates that the members of the engineering department did not receive LOTO training until June 2016, and training was provided in June 2016 "largely" because Mr. Dowling was concerned that training had not occurred. (Doc. 42, p. 20, ¶ 34). Based on PCH's employee records, the proposition that LOTO training did not take place until June 2016 is disingenuous as is the assertion that Mr. Fulmer provided training only at

Mr. Dowling's behest—unless PCH's OSHA training records are entirely unreliable.

The evidentiary record demonstrates that PCH's training records are mostly, but perhaps not entirely, unreliable. PCH's training records are incomplete and poorly maintained. For example, one PCH record indicates that Mr. Emerson participated in OSHA LOTO training in June 2016, but Mr. Emerson's personal training record omits the June 2016 training (and many others during his tenure at PCH if PCH was fulfilling its obligation to provide annual OSHA training). (*Compare* Doc. 41-6, pp. 57-59 *and* Doc. 41-6, p. 55; *see also* Doc. 41-5, p. 89, tp. 349).[9] The minutes of the June 2016 LOTO training meeting contain no information about the author of the minutes, and Mr. Bowser does not know where the minutes came from or where they were maintained at PCH. (Doc. 41-5, p. 89, tpp. 349–51).

So jurors reasonably could conclude that when Mr. Bowser and Ms. Thomas met with Mr. Fulmer the week before Mr. Bowser fired him, and he told them that he had not conducted LOTO training in March 2015, he was confused. But Mr. Fulmer would have no way of proving that he simply was confused because PCH did such a poor job of making and maintaining records of employee training. And, again, Mr. Bowser reported to PCH's carrier that the March 2015 training was completed and documented. He should have known that Mr. Fulmer was confused

---

[9] If PCH was not monitoring its employee records to ensure that employees were receiving annual OSHA training (Mr. Emerson's training record indicates that he received OSHA training twice in seven years), then jurors reasonably could conclude that PCH was not truly concerned with "**Major OSHA Violation[s]**." (Doc. 41-3, p. 30; Doc. 41-6, p. 54).

if he provided accurate information to PCH's carrier.

PCH's records of employment actions are as inconsistent and confusing as its records of employee training. As noted, the July 1, 2016 Associate Disciplinary Action form relating to Mr. Fulmer's termination describes the June 2016 LOTO violation and the June 2016 gas smell "that had not been addressed even after it had been reported," reflects that "[t]his is the second time that the property has experienced a negative walk," and states that Mr. Fulmer was "suspended pending termination for unsatisfactory performance creating an unsafe work environment." (Doc. 41-3, p. 93). The July 6, 2016 Personnel Action Form concerning Mr. Fulmer's termination indicates that PCH terminated him based on "Special Circumstances." (Doc. 41-15, p. 64).[10] In this litigation, PCH takes the position that it terminated Mr. Fulmer for "serious misconduct as determined by the General Manager." (Doc. 41-5, p. 27, tpp. 102–03). "[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006).

So may a company's deviation from established policies. *See Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 831 (11th Cir. 2000). PCH now

---

[10] That form also indicates, with a typewritten "yes" that Mr. Fulmer was to receive "Vacation Pay Out," but the "Yes" is circled and lined out, and the word "no" is handwritten beside the word "Yes."

characterizes Mr. Fulmer's role in the June 2016 walk as "serious misconduct" to explain the company's failure to follow its progressive discipline policy when it terminated Mr. Fulmer.  To avoid the Associate Handbook provisions regarding a step-based approach to employee discipline, PCH could terminate Mr. Fulmer immediately only for "Gross Misconduct."  (*See* Doc. 41-5, p. 184).  The handbook states: "[s]erious violations of company policy will result in termination without previous warning" because those violations are "serious breaches of responsibility to the company."  (Doc. 41-5, p. 182).  A serious violation of company policy includes "[s]erious misconduct as determined by the General Manager" or an "incident of gross misconduct and/or negligence"; none of these violations requires a prior written warning before termination.  (Doc. 41-5, pp. 182–84, 188).  Absent a serious violation of company policy, PCH's progressive discipline policy authorizes termination of a managerial employee who receives one written warning and then commits a second infraction within 12 months.  (Doc. 41-5, p. 182).  Mr. Fulmer did not have a written warning in the 12 months preceding his termination that would have enabled PCH to terminate him under the progressive discipline provisions of PCH's Associate Handbook.

When Mr. Bowser, the Shoals general manager, fired Mr. Fulmer, he (Mr. Bowser) had never terminated an employee immediately for serious misconduct.  In the ten years preceding Mr. Fulmer's termination, Mr. Bowser had terminated one

employee without using progressive discipline, and that employee was terminated for theft. (Doc. 41-5, p. 27, tpp. 103–04). PCH did not terminate Mr. Bowser when, as a 40-year-old, he received a DUI while driving a company vehicle, an instance of gross negligence if not gross misconduct.[11]

Other circumstances surrounding Mr. Fulmer's termination are suspicious. First, PCH offered Mr. Fulmer a written "Confidential Settlement Agreement and Release," an unprecedented action at the Shoals. The severance agreement, had Mr. Fulmer agreed to it, would have been a lawful waiver of rights under the ADEA, but the severance agreement would have preserved Mr. Fulmer's right to file a charge of discrimination with the EEOC. (Doc. 41-3, pp. 95–96).[12]

---

[11] Mr. Bowser was arrested for DUI in 2008 while he was driving a PCH company vehicle. (Doc. 41-5, p. 28, tpp. 105–07; Doc. 41-5, pp. 190–94). He reported the DUI to the CEO and the Vice President of Human Resources. (Doc. 41-5, p. 29, tp. 109). PCH's Associate Handbook, as revised in September 2015, states: "Being under the influence of a drug or alcohol on the job poses serious safety and health risks, not only to the user but also to all those who work or come into contact with the user . . . Associates who test positive for drugs and/or alcohol will be terminated." (Doc. 41-5, pp. 132, 180–81).

PCH did not issue Mr. Bowser written discipline or take away his driving privileges, but the company informed him that he would be terminated "if there was another incident." (Doc. 41-5, p. 29, tpp. 109–11). Mr. Bowser put himself and others in danger by driving while intoxicated, and he was driving a company car, creating potential liability for PCH, just as Mr. Fulmer created potential liability for the company by not monitoring the washing machine LOTO issue properly. PCH could have fired Mr. Bowser for the DUI without notice. The company's decision not to fire Mr. Bowser indicates a lack of consistency with respect to PCH's "gross negligence" or "gross misconduct" standard.

[12] An employee may waive his right to sue his employer under the ADEA if he waives his right "knowingly and voluntarily." 29 U.S.C. § 626(f)(1). For a waiver to be considered knowing and voluntary, the waiver must be part of a written agreement; the waiver must specifically refer to ADEA rights; the waiver must not include claims that may arise after the date the waiver is executed; the employee must waive his rights in exchange for consideration; the employer must

In addition, after characterizing five days' notice of a walk as "late notice" in 2015, Mr. Dowling gave just 24-hours' notice for June 2016 walk. (Doc. 41-6, p. 26). In an email to Mr. Bowser dated June 20, 2016, the day before the June 2016 walk, Ms. Thomas remarked: "Kind of late notice." (Doc. 41-3, p. 37). Mr. Bowser replied: "No doubt . . . ." (Doc. 41-3, p. 37). Mr. Dowling knew that employees spent the days leading to an announced walk preparing for the workers' compensation inspection. (See, *e.g.* Doc. 41-3, pp. 2–3) (September 2015 email describing results of "pre-walkthrough" by Ms. Thomas, Ms. Shook, Mr. Fulmer, and Caleb Albright (PCH's Loss Prevention Supervisor) in preparation "for the Worker's Compensation Walkthrough" that would take place at least three business days later); (Doc. 41-6, p. 28) (June 20, 2016 email from Mr. Bowser advising recipients to walk their respective areas because "[t]hings need to be cleaned, organized and well kept"); (Doc. 41-6, p. 30) (June 20, 2016 email from Mr. Bowser

---

advise the employee to consult with an attorney; the employee must have at least 21 days to consider the agreement; and the employee must have the option to revoke the agreement within seven days of execution. 29 U.S.C. § 626(f)(1)(A)–(G). The written severance agreement in this case meets these requirements. (*See* Doc. 41-3, pp. 94–100).

PCH argues that the severance agreement is an inadmissible "compromise offer" under Federal Rule of Evidence 408. (*See* Doc. 61, pp. 15–16). But, because Mr. Fulmer has not had an opportunity to respond to PCH's Rule 408 objection, and to have Mr. Fulmer fully heard on summary judgment, the Court will consider the severance agreement at this stage of the proceedings because the agreement may be admissible at trial. *See* Fed. R. Evid. 408(b); *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (finding that a district court may consider inadmissible evidence at the summary judgment stage if the evidence could be reduced to admissible form at trial); *Tolbert v. Follett Higher Educ. Grp., Inc.*, 2006 WL 559462, at *9 (M.D. Ala. Mar. 7, 2006) (considering evidence that a company offered severance benefits to a terminated employee on summary judgment in an employment discrimination case).

to Tony Fowler, PCH's Director of Events, stating: "I need you to own it. Stairwells, Exits, Fire Extinguishers, Back Dock . . . You know what they look for."). Jurors reasonably could conclude that Mr. Fulmer's failure to follow up on the washing machine LOTO violation was understandable, given his effort to prepare the entire Shoals property for an inspection in only 24 hours.

And Mr. Dowling proceeded with the walk even though he knew that Mr. Bowser and Ms. Thomas could not attend. (Doc. 41-3, p. 37; Doc. 41-6, p. 26; Doc. 41-12, p. 6, tp. 295). After the walk, Mr. Dowling prepared a site-visit report, an exercise he never had done for the Shoals. (Doc. 41-11, p. 17, tpp. 63–64).[13] Departures from routine like these may serve as circumstantial evidence of discriminatory conduct. *Hurlbert*, 439 F.3d at 1299.

PCH offers various explanations for the evidence that contradicts the three reasons PCH now states for its termination of Mr. Fulmer. For example, PCH argues that it could fairly make Mr. Emerson the acting head of the engineering department and name him supervisor of the year after his LOTO violation and fire Mr. Fulmer

---

[13] The record demonstrates that Mr. Davis asked Mr. Dowling to prepare a site report about the June 2016 walk after Mr. Dowling told Mr. Davis that there was a LOTO issue during the walk. Mr. Davis had requested a report from Mr. Dowling once before in connection with a walk at PCH's Prattville property. (Doc. 41-11, pp. 48–49, tpp. 186–91).

Mr. Fulmer questions why Mr. Dowling took photographs during the June 2016 walk, but Mr. Dowling also took photographs during the February 2015 walk and appeared to testify that he routinely took photographs during other walks. (Doc. 41-7, pp. 19, 21, tpp. 69–70, 77–80; Doc. 41-7, pp. 70–130).

for the same violation because Mr. Emerson and Mr. Fulmer had different levels of responsibility for the LOTO violation, and they played different roles in the LOTO violation. PCH states that it disciplined Mr. Emerson for his failure to lock out and tag out the machine, and it disciplined Mr. Fulmer for his oversight of the LOTO violation. Jurors must sort through the evidence and arguments and determine whether PCH's articulated reasons for Mr. Fulmer's termination are pretext for age discrimination such that PCH would not have terminated Mr. Fulmer were it not for his age. Because the record contains evidence of many inconsistencies and irregularities that contradict and undermine PCH's stated reasons for Mr. Fulmer's termination, the Court will deny PCH's motion for summary judgment on Mr. Fulmer's ADEA and AADEA discrimination claims. *Hinson*, 231 F.3d at 831 ("But the court erred in requiring Dr. Hinson to show not only pretext but also additional evidence that the Board discriminated against her based on her sex.")[14]; *see generally Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147–48 (2000) (discussing pretext evidence in context of Rule 50 motion).

---

[14] Mr. Fulmer argues that the suspicious circumstances surrounding his termination may be attributed to age discrimination because the evidence shows that (1) PCH needed to reduce its health insurance costs and it could do so by eliminating older employees; (2) PCH's CEO wanted his employees to be passionate, energetic, aggressive, "constantly challeng[ed] . . . to create new ways to be energized," and to "overcome the 'rote and routine' aspect of human nature," all of which Mr. Fulmer contends reflect animus against older employees; and (3) Ms. Thomas asked Mr. Fulmer at a work lunch in February 2016 when he would retire. (*See* Doc. 49, pp. 44–46). Because there is sufficient circumstantial evidence of pretext to warrant a jury trial, the Court does not have to evaluate this additional evidence to resolve the pending motion for summary judgment.

**B.**     <u>Retaliation</u>

Mr. Fulmer contends that PCH retaliated against him for refusing to sign the severance agreement by withholding his accrued vacation time and paid time off. (Doc. 49, p. 48).   The ADEA prohibits an employer from taking adverse action against an employee because he "opposed any practice made unlawful by [the ADEA]." 29 U.S.C. § 623(d).   The AADEA does the same.   *See* Ala. Code § 25-1-28.   The analytical framework that applies to retaliation claims brought under Title VII applies to retaliation claims brought under the ADEA and the AADEA.   *King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1258, 1264 (N.D. Ala. 2014).

A plaintiff may use the *McDonnell Douglas* burden-shifting framework to maintain a retaliation claim based on circumstantial evidence.   *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016).   Initially, a plaintiff must establish a *prima facie* case by showing that (1) he "engaged in statutorily protected conduct"; (2) he "suffered an adverse employment action"; and (3) that "the adverse action was causally related to the protected expression."   *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1193–94 (11th Cir. 2016).   If a plaintiff establishes a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the challenged action.   *Trask*, 822 F.3d at 1194.   Then the burden shifts to the plaintiff again to show that the employer's reason is pretext for retaliation.   *Trask*, 822 F.3d at 1194.   If the plaintiff carries this ultimate burden, then

he will survive summary judgment.  *Trask*, 822 F.3d at 1194.

Under the first element of a *prima facie* case of retaliation, a plaintiff engages in statutorily protected conduct under the ADEA if he opposes "any practice made unlawful" by the ADEA or "ma[kes] a charge, testifie[s], assist[s], or participate[s] in any manner in an investigation, proceeding, or litigation under [the ADEA]."  29 U.S.C. § 623(d).  A plaintiff also engages in statutorily protected conduct when he opposes practices that he honestly and reasonably believes to be unlawful, even if he is mistaken in that belief.  *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).  A plaintiff "must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented."  *Little*, 103 F.3d at 960 (emphasis in original).

Mr. Fulmer asserts that he engaged in statutorily protected activity by refusing to sign the severance agreement after PCH terminated him.  (Doc. 49, p. 48).  Mr. Fulmer argues that the severance agreement was unlawful because it would have required him to waive his right to sue PCH under the ADEA.  The Court disagrees.

As noted above, the severance agreement was not unlawful because it met the requirements for a valid waiver of rights under the ADEA.  *See* 29 U.S.C. § 626(f)(1)(A)–(G); (Doc. 41-3, pp. 94–100); *see also* footnote 12, above.  Mr. Fulmer had no objectively reasonable basis to consider the waiver unlawful; he had

no reason to assume that ADEA waivers are *per se* unlawful, and the severance agreement informed him that it "comport[ed] with the requirements for waiving ADEA claims set forth in the Older Workers Benefit Protection Act of 1990." (Doc. 41-3, p. 96). So Mr. Fulmer did not oppose conduct made unlawful by the ADEA, and he had no reasonable belief that he was doing so. Because he did not engage in statutorily protected activity, he cannot establish this necessary element of his *prima facie* case of retaliation using the *McDonnell Douglas* burden-shifting framework.

As with a discrimination claim, "[a] convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that . . . retaliatory intent motivated an employment decision." *Moore v. Pool Corp.*, 304 F. Supp. 3d 1148, 1162 (N.D. Ala. 2018) (citing *Lockheed–Martin Corp.*, 644 F.3d at 1328, and *Calvert v. Doe*, 648 Fed. Appx. 925, 929 (11th. Cir. 2016)). As discussed at length, the circumstances surrounding Mr. Fulmer's termination undermine PCH's stated reasons for firing him. Jurors reasonably could conclude that PCH took the unprecedented step of offering Mr. Fulmer's vacation benefits to him conditioned on his execution of a settlement agreement to cover its tracks, and PCH withheld Mr. Fulmer's benefits when he refused to go along with PCH's plan. The record demonstrates that the head of the engineering department at another PCH hotel who was more than 60 years of age when PCH terminated his employment for an alleged LOTO violation received his vacation benefits without having to sign a release.

(Doc. 48-8, pp. 2–3).  Therefore, the Court will deny PCH's motion for summary judgment on Mr. Fulmer's retaliation claim.

## C.   Negligent and Wanton Hiring, Training, Supervision, and Retention

Mr. Fulmer brings a state law claim against PCH for its alleged negligent and wanton hiring, training, supervision, and retention of Mr. Bowser.  Mr. Fulmer asserts that PCH negligently retained Mr. Bowser after he committed a DUI in a company vehicle.  (Doc. 48, pp. 48–49).  Mr. Fulmer also contends that proof that PCH violated the ADEA and the AADEA is sufficient to establish a tort claim for negligent and wanton hiring, training, supervision, and retention.  (Doc. 48, pp. 49–50).  The Court disagrees on both points.

Neither Mr. Bowser's DUI nor PCH's response to it bears upon Mr. Bowser's role in Mr. Fulmer's termination.  No reasonable juror could infer negligent or wanton hiring, training, supervision, or retention from PCH's response to a DUI that occurred eight years before Mr. Fulmer's termination.  And under Alabama law, a plaintiff alleging negligent hiring, training, retention, and supervision must prove that an employee committed unlawful conduct under Alabama common law.  *See Shuler v. Ingram & Associates*, 441 Fed. Appx. 712, 720 (11th Cir. 2011); *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002).  Because "[f]ederal causes of action under . . . the ADEA as well as the Alabama statutory cause of action for age discrimination are not Alabama common law,"

40

those claims "cannot support a claim of negligent hiring, training, retention, and supervision." *Shackelford v. Publix Super Markets, Inc.*, 2014 WL 5148461, at *16 (N.D. Ala. Oct. 14, 2014) (citing *Ellis v. Advanced Tech., Servs., Inc.*, 2010 WL 3526169, at *2 (M.D. Ala. Sept. 3, 2010), and *Rabb v. Georgia Pac., LLC*, 2010 WL 2985575, at *16 (S.D. Ala. July 26, 2010)).  The Court will grant summary judgment in PCH's favor on that claim.

### D.   <u>Invasion of Privacy</u>

Mr. Fulmer asserts that PCH committed the tort of invasion of privacy because the company "portrayed [him] as an incompetent manager who lied about training and hid potential workers' compensation deficiencies from inspectors"; accused him of "eroding trust and creating an impression of dishonesty" after the February 2015 walk; and "falsely portrayed [him] as dangerous and accused him of lying and committing 'gross misconduct.'"  (Doc. 49, p. 50).  Under Alabama law, none of PCH's actions constitute an actionable invasion of privacy.

Under Alabama law, "invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use." *Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997).

41

Mr. Fulmer's invasion of privacy claim invokes both the intrusion into solitude and false light theories. To state a claim for invasion of privacy based on intrusion into solitude, "the plaintiff must establish a highly offensive intrusion upon his solitude or seclusion or his private affairs." *S.B. v. Saint James Sch.*, 959 So. 2d 72, 98 (Ala. 2006). And the intrusion must be highly offensive to a reasonable person and cause "outrage[,] mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986).

None of PCH's actions is sufficiently offensive conduct to support an invasion of privacy claim. The memo that Mr. Bowser issued to Mr. Fulmer after the 2015 walk, though critical of Mr. Fulmer, contains no statements that would be highly offensive to a reasonable person. The memo stated that Mr. Fulmer made the "now to the conference center" statement and whispered to Ms. Shook to stop opening doors. (Doc. 41-2, p. 127). In the memo, Mr. Bowser called Mr. Fulmer's actions inappropriate and stated that Mr. Fulmer created an impression that the Shoals staff was trying to hide something and eroded trust between PCH and its insurance carrier. (Doc. 41-2, p. 127). None of these statements, individually or collectively, would cause outrage, shame, or humiliation in the mind of a reasonable person in Mr. Fulmer's position. So PCH's response to the February 2015 walk cannot support an invasion of privacy claim.

Mr. Fulmer's opinion of how PCH made him look when the company terminated him does not support an invasion of privacy claim.  Mr. Fulmer contends that PCH made him look like a liar, incompetent, and dangerous when it terminated him.  (Doc. 49, p. 50).  But Mr. Fulmer made the statement that gave the appearance that he had misrepresented information about LOTO training.  He bears responsibility for the impression that he created.

Mr. Fulmer's alternative theory of invasion of privacy—that PCH placed him in a false light—fares no better.  To state a claim for invasion of privacy based on being placed in a false light, the plaintiff must show that "the false light in which the [plaintiff] was placed would be highly offensive to a reasonable person" and that "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *S.B.*, 959 So. 2d at 93 (internal quotation marks omitted).  Mr. Fulmer has not shown either element.

First, Mr. Fulmer suffered no sufficiently outrageous humiliation or shame from PCH's criticisms of his conduct during the February 2015 walk or the company's explanation for his termination.  Second, PCH did not publicize false information.  The memo issued after the February 2015 walk describes the events that occurred and expresses Mr. Bowser's opinion of the impact of Mr. Fulmer's conduct; Mr. Fulmer agreed that his comments to Ms. Shook during the February

43

2015 walk were inappropriate and apologized.  (Doc. 41-1, p. 49, tp. 204; Doc. 41-2, p. 128).  So Mr. Fulmer cannot establish a false light claim under Alabama law. The Court will enter summary judgment for PCH on that claim.

### E.   Intentional Infliction of Emotional Distress

Mr. Fulmer asserts that he suffered actionable emotional distress because he "was targeted, terminated, made to look like a fool, and kicked out of his more than two-decade work home, all in violation of policy and without an opportunity to appeal, and he suffered because of it."  (Doc. 49, p. 51).

Under Alabama law, the tort of intentional infliction of emotional distress, also called the tort of outrage, requires proof of four elements:  "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) that the distress was severe."  *Harris v. McDavid*, 553 So. 2d 567, 569–70 (Ala. 1989).  For conduct to be "extreme and outrageous" under the second element, the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Harris*, 553 So. 2d at 569–70 (internal quotation marks omitted). For example, the Alabama Supreme Court has found disinterring and desecrating a corpse to be actionable extreme and outrageous conduct.  *Gray Brown-Serv.*

*Mortuary, Inc. v. Lloyd*, 729 So. 2d 280, 285–86 (Ala. 1999).  On the other hand, actionable extreme and outrageous conduct did not exist in a case where a law enforcement officer coerced a prisoner into waiving her rights, lied that her attorney abandoned her, and threatened her with "sizzling" and "frying" in the electric chair. *Tinker v. Beasley*, 429 F.3d 1324, 1330–31 (11th Cir. 2005).  Here, PCH's conduct falls short of the stringent threshold for actionable extreme and outrageous conduct under Alabama law.  Therefore, no genuine dispute of material fact exists as to Mr. Fulmer's intentional infliction of emotional distress claim, and PCH is entitled to judgment as a matter of law on that claim.

## IV.    Conclusion

For the reasons stated, the Court denies PCH's motion for summary judgment on Mr. Fulmer's age discrimination and retaliation claims.  The Court grants PCH's motion for summary judgment on Mr. Fulmer's state law claims.  The Court will enter a separate order setting this matter for trial.

**DONE** and **ORDERED** this April 20, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE